PENNSYLVANIA FIRE INSURANCE CO. v. ANN ARBOR
RAILROAD CO.

1. APPEAL AND ERROR—INSURANCE—FIRE—RAILROADS.

In determining whether the evidence of plaintiff, who brought an action for the negligence of defendant railroad company in setting fire to his house, made out a case for the jury, the testimony must be considered in the light most favorable to him, irrespective of any evidence in defendant's behalf tending to contradict it.

2. INSURANCE—FIRES—RAILROADS—NEGLIGENCE.

Testimony in behalf of plaintiff, who charged that defendant negligently set fire to his house, was sufficient to require the court to submit the case to the jury where it tended to show that the defendant railroad company occupied land 46 feet away from plaintiff's house; that the season had been dry; that immediately preceding the commencement of the fire a switch engine had been passing along the track near the house and that the wind blew considerable quantities of smoke from it to the dwelling; that there was no fire in the house and that the roof was ignited upon the side toward the railroad track from which direction the wind was blowing; other evidence tending to connect the engine with the fire and the testimony having a tendency to show that the spark arrester in the smoke stack had become defective and had been patched; although defendant's inspector gave evidence that the spark netting was in good order before the fire.

3. SAME—EVIDENCE—SETTING FIRES.

The statute relating to the liability of railroad companies where a fire is set by its locomotives (2 Comp. Laws, § 6295; 3 How. Stat. [2d Ed.] § 6649), changes the burden of proof and shifts the same upon the defendant so as to require it to show that the engine was properly equipped and netted.

4. EVIDENCE—RAILROADS—OPINION EVIDENCE—EXPERT TESTIMONY.

Upon the trial of an action for negligently setting fire to a house the trial court was not in error in admitting in

evidence the testimony of an engineer of about 13 years' experience, to the effect that an engine properly equipped would not throw sparks of sufficient vitality to set a fire at the distance at which plaintiff's house stood from the track, though the witness qualified his statement on cross-examination by an admission that dry weather would add to the vitality of the spark and that in times of drouth it would be possible for a spark of sufficient vitality to set a fire to escape through the netting.

5. TRIAL—EVIDENCE—EXCLUSION OF TESTIMONY.

The exclusion of reports of an inspection made by defendant's inspector immediately before and after the date of the fire tending to show that the locomotive which it was claimed had caused it was in proper condition, which were excluded by the court with the statement that counsel might present the point later, where counsel did not again bring the matter up for final ruling, did not constitute reversible error though the exhibits might properly have been admitted.

Error to Gratiot; Searle, J.  Submitted November 6, 1914.  (Docket No. 139.)  Decided March 17, 1915.

Case by the Pennsylvania Fire Insurance Company against the Ann Arbor Railroad Company for negligent operation of its locomotives and the setting of a fire.  Judgment for plaintiff.  Defendant brings error.  Affirmed.

*Gustavus Ohlinger* (*Alexander L. Smith*, of counsel), for appellant.

*Arthur P. Hicks* and *Charles H. Goggin*, for appellee.

STEERE, J.  On September 1, 1908, plaintiff insured for a term of three years the so-called Amanda M. Hicks frame residence in Alma, Mich.  On February 2, 1910, a second policy was issued by plaintiff providing for $500 additional indemnity on the house and $900 on its contents.  Near midday of July 11, 1911, the house was damaged by fire.  Before an adjustment

was reached, Amanda Hicks died, and plaintiff subsequently settled the loss with her administrator by payment of $1,092.25, becoming subrogated under the terms of the insurance contract to whatever rights the insured might have, in respect to the loss, against any third party. This action was begun, on July 16, 1913, by declaration against defendant charging, amongst other things, negligence in the matter of the operation and repair of its engines whereby fire was communicated to said house, properly alleging liability for the resulting loss under section 6295, 2 Comp. Laws (3 How. Stat. [2d Ed.] § 6649), relative to damages by fire originating in operating a railroad. Defendant pleaded the general issue. On trial of the case before a jury in the circuit court for Gratiot county, plaintiff recovered the amount it paid to settle said loss, with interest.

While various other questions are raised by defendant's assignments of error, that chiefly urged and argued, and manifestly calling for most serious consideration, is the denial by the court of defendant's motion for a directed verdict in its favor on the ground that plaintiff's testimony furnished no probative evidence that the fire in question originated from defendant's engine, which was charged with having caused the fire, or that said engine was not in good order and properly managed; defendant's positive evidence showing that it was.

The portion of section 6295, 2 Comp. Laws, upon which right of recovery is predicated, provides:

"Any railroad company building, owning, or operating any railroad in this State, shall be liable for all loss or damage to property by fire originating from such railroad, either from engines passing over such roads, fires set by company employees. * * * *Provided*, that such railroad company shall not be held so liable if it prove to the satisfaction of the court or jury, that such fire originated from fire by engines whose machinery, smokestack or fire boxes were in good order and properly managed. * * *"

The Hicks residence, a two-story, frame dwelling house with a shingled roof over 15 years old, its eaves 21 feet from the ground, stands upon a lot adjoining on the east a railroad right of way, running northeasterly and southwesterly, jointly occupied by parallel tracks of the Pere Marquette and defendant Ann Arbor Railroads. The lot is bounded on its east by Wright avenue running north and south, and at the south by Superior street, towards which the house fronts, and which runs east and west, crossing the right of way. The house is 46 feet east of the right of way, and from a point immediately under the north valley of its west gable, near which plaintiff showed fire was first discovered, to the center of defendant's track, which runs 13 feet nearer the house than that of the Pere Marquette, is 51½ feet. The nearest building to this house is the so-called Cheeseman residence, in the same block, some 50 or 60 feet to the north. All other buildings in that vicinity are some distance father away, across streets or the railroad tracks. Except for the railroads and their buildings, the section is purely residential. The lever of a switch of the Ann Arbor Railroad's track is located a short distance south of the house, from which point the switch extends its entire length northwesterly to its freight depot, which is about one block north of the Hicks house and 60 rods northwest of the passenger depot. The Pere Marquette has no switch here.

In considering defendant's contention that plaintiff's circumstantial evidence bearing upon the origin of the fire goes no further than to show the fire might have been ignited by sparks from defendant's engine, and does not amount to probative evidence that it did so originate, we find testimony in the record which, if true—and it must be so considered in passing upon such contention—warranted the court in submitting that issue to the jury. In outline it is as follows: The house was occupied as a residence by members of the

Hicks family. There were no electric light or telephone wires in it. The only fire inside the house that day was kindled in the kitchen stove in the morning and was all out at 8 o'clock. Two west rooms in the second floor were occupied by a chiropractor named Keene, who received and treated his patients there. He was the only person in the house at the time the alarm of fire was given. He had, while working with a patient about 40 minutes previous, been so annoyed with smoke coming from an engine switching opposite the house that he was obliged to close the window. He last noticed the engine, shortly before the fire, where it stood on the switch track near the switch lever for a short time, sufficient to shift the switch, when it went north. The switching was done from the main line of the Ann Arbor road onto its siding. Shortly after it left he was notified the house was on fire outside and went down upon the ground where he could see it. It was on the west side of the roof, on the surface, right in the gable towards the tracks, on the upper part of the eaves, six or eight inches in circumference. He immediately went upstairs and into the garret but could discover no fire on the inside. The fire was discovered by a boy who pointed it out to a man named Shaw, defendant's flagman at that crossing, who notified Keene and gave the alarm. Though on the morning of the fire a slight rain fell showing a precipitation of .03 of an inch, it had ceased by 7 o'clock. From the 1st to the 10th of July the weather was exceptionally dry and warm, the mean temperature being above 93 degrees. On July 11th, the date of the fire, it was 89 degrees with a wind blowing at a rate of 8 to 10 miles an hour from the southwest, approximately at right angles to the railroad, and from it towards the Hicks house. The engine engaged in switching, identified by certain witnesses as No. 100, was engaged in switching west of and past the Hicks house for from about 40 minutes

before the fire was discovered until it left, from 3 to 5 minutes before the alarm.

Numerous witnesses testified, and there was abundance of conflicting evidence; but, without further detail, it can be said this record clearly contains evidence tending to show: That at the time this fire caught the wind was blowing from the railroad track, and from the locality where this engine was working, towards the house. That there had been a season of excessively dry, hot weather, continuing that day except for a slight shower in the early morning, followed by wind and some sunshine for several hours before the fire, which was first discovered after 11 o'clock. Defendant's flagman, Shaw, testified:

"It was a nice day, and the sun was shining at the time of the fire. It had been shining before 11 o'clock."

That there were no other buildings near to the Hicks house, which was in a residential neighborhood with no factories in the vicinity. There were no fires inside the house, and but one person within at the time, Dr. Keene, who was disturbed in his work by black smoke coming from the switching engine to such an extent that he found it necessary to close his windows. That all the witnesses but Shaw, who located it in the cornice, testified that the fire was first seen on the outside of the upper part of the house on a part of the roof towards the railroad track and but a few inches from the gutter. That parties going to the attic could find no fire or smoke on the inside. That this locomotive was switching back and forth past the house on the windward side laboring and emitting volumes of smoke but a short time before the fire was discovered—showing proximity of time and place.

Regardless of how persuasive defendant's evidence may be to the contrary, with such testimony in the case there was sufficient to go to the jury upon the

origin and source of the fire under the rule laid down in *Jones* v. *Railroad Co.,* 59 Mich. 437 (26 N. W. 662) ; *Hagan* v. *Railroad Co.,* 86 Mich. 615 (49 N. W. 509) ; *Clark* v. *Railway Co.,* 149 Mich. 400 (112 N. W. 1121, 12 Am. & Eng. Ann. Cas. 559) ; *Potter* v. *Railway Co.,* 157 Mich. 216 (121 N. W. 808, 22 L. R. A. [N. S.] 1039) ; *Union Ice Co.* v. *Railway Co.,* 178 Mich. 346 (144 N. W. 1033).

There being evidence to support the finding of the jury that the fire was started by sparks from defendant's locomotive, and the jury having so found, to escape liability it became incumbent upon defendant to assume the burden and show that its engine was in good order, properly equipped and managed.

Upon that phase of the case defendant contends a verdict should have been directed in its favor for the reason that all competent evidence bearing upon that subject was uncontroverted and conclusively established full compliance by defendant with the exculpatory provisions of the statute under which plaintiff seeks to recover.

The trial court did not leave to the jury the question of negligent or improper operation of the engine, saying among other things:

"As applied to this case, there is no evidence of improper management. Consequently, I use the term properly equipped, and, as applied to this engine, you will take up that question. * * * Take up the question of whether or not this engine was properly equipped within the statute that I have read to you here. If the defendant railroad company have shown to you, to your satisfaction, by a preponderance of the evidence, that it was so equipped, then that is the end of the case, even though you find that the engine set the fire in question. They are liable only when it is not properly equipped."

This was referred to more than once and emphasized in different parts of the charge. Passing from instructing the jury as to the first question for them

to determine—whether the evidence showed to their satisfaction that defendant's engine caused the fire—the court said:

"If you get to the second question, the second question is: Was this engine properly equipped? If it was, and the railroad company has shown to your satisfaction by a preponderance of the evidence that it was, then that is the end of the case, regardless of how the fire was set. If it was not and you have previously found that the fire was set by the engine, then you determine what the damages are."

In interpreting the proviso of the statute as applied to the question at hand, this court said, in *Dolph* v. *Railway Co.*, 149 Mich. 278 (112 N. W. 981):

"The statute shifts the presumption of non-negligence to the presumption of negligence. See *Fisk* v. *Railroad Co.*, 114 Mich. 248 (72 N. W. 205). We there said: 'The statute does not change the common-law liability for setting fires. It simply shifts the burden of proof upon the defendant to show that such fires were not negligently set.'"

The *Dolph Case* contains a somewhat exhaustive discussion of this question, as a result of which the conclusion is reached, in substance, that if defendant establishes by reputable and uncontroverted evidence the fact that its engine was in good condition, equipped as required by the statute and according to good railroading, no question of fact arises for the jury, and a verdict should be directed for defendant by the court. Having occasion later to construe what was there said, considered in its entirety, this court, in *Clark* v. *Railway Co.*, *supra*, stated the rule to be as follows:

"If upon the whole case there is room for inference, based upon evidence, that equipment was defective or that management was improper, the case is for the jury. Whether, in any case, the fact of setting a fire would be any evidence of infirmity of apparatus or of improper management, must depend upon other facts and circumstances in evidence."

In reversing the latter case on the ground that there was a lack of other facts and circumstances in evidence to raise an issue upon the question of proper equipment, the court pointed out an important consideration, and emphasized the fact, that:

"There is no testimony that an engine in good repair, equipped as this engine was, will throw sparks 30 or 35 feet and set a fire."

In the case at bar the defendant introduced testimony to the effect that the engine in question was properly equipped and in good condition according to approved standards of railroading. This calls for a determination as to the conclusiveness of such testimony and whether, based upon all the evidence, there is room for an inference that the equipment was, in the particular specified in the statute, defective.

As bearing upon the condition of the "machinery, smokestack, or fire box" of the engine, defendant produced four witnesses: Jennings, assistant master mechanic of the Michigan Central Railway; Reifsnider, engineer on engine No. 100 at the time of the fire; Rathburn, the boiler maker in defendant's shops; and Hobbs, its general foreman and formerly its boiler maker foreman. Jennings as an expert described and explained from a diagram the standard fronts of locomotives, and their variations, with reference to appliances designed to prevent throwing sparks, etc., stating at the conclusion of his direct examination that a smoke box could not be devised "that absolutely prevents throwing cinders through the stack." Rathburn, with two and a half years' experience inspecting front ends and ashpans, testified to inspecting engine 100 at 8 or 9 o'clock on the evening following this fire; was told that there had been a fire at Alma and to inspect 100 thoroughly; that he put a little piece of oily waste behind the baffle-plate and another down the stack to examine the netting;

found the baffle-plate, netting, and ashpan in good condition, there being no patches on the screen, the netting good, not burned, and he placed no patches upon the screen on that occasion. This, standing alone, appears convincing and conclusive beyond contrary inference; but on cross-examination he denied telling a Mr. Butterfield that the screen was somewhat burned, and refused to admit or deny that some time during the trial he had told Mr. Butterfield that there were patches upon it. Butterfield testified on rebuttal:

"Rathburn told me yesterday in this courthouse, in the presence of Mr. Shaw and Mr. C. A. Hicks, that he was asked to make an examination of the screen of this locomotive after the fire. He stated that there were patches upon it and that the screen was somewhat burned."

He also denied knowing a man named Charles Powers, but stated he would neither admit nor deny that 11 months later than the fire he had made a statement on the subject at the instance of Charles Powers, who then reduced it to writing. Shown the signature to such alleged statement, he declined to admit that it was his writing. Powers testified on rebuttal that he interviewed Rathburn as indicated in the questions put to him upon cross-examination and wrote down what he then said and read it over to him; that he then signed said statement, after having also himself read it. This writing, previously shown to Rathburn as described and identified by Powers, was put in evidence and contained, amongst others, the following statements:

"In regard to inspecting engine No. 100, I was working at the A. A. roundhouse during the month of July, 1911. I was night boiler maker. * * * The engineer left an order to fix the spark arrester; that it was throwing sparks bad. * * * I do not know the exact date. Anyhow, at that time, I put a strip of netting around the spark arrester where I

thought sparks could get out.  *   *   *  Usually, when we fixed an engine, we would just make a report, 'Engine all right.'   *   *   *   Engine 100 gave us the most trouble anyhow; it was reported throwing sparks the most.  *   *   *   There are thin plates also where sparks could get through if they were not closely watched; that is, if they wore through.  Also, where bolts go through.  *   *   *   I think engine 100 was reported once again after I fixed the spark arrester.  *   *   *"

J. V. Reifsnider, engineer of No. 100 on July 11, 1911, testified as to the condition of the engine on direct examination:

"I opened the front end of engine 100  *   *   *  probably 30 or 40 minutes after the fire.  *   *   *   I examined the netting, and the netting was perfect on all sides; bolted well all around and the trapdoor was O. K."

This can scarcely be said to cover the ground specified in the statute and was modified as follows on cross-examination:

"I did not examine the baffle-plates.  It was too hot. I know nothing about the plates in the back of the front end.  I did not examine the plate around the exhaust pipe.  I could see that there were cinders lying on top of it, but these gases were so strong that I could not get my head far enough in to tell through the netting.  It was so dark back in there and the small amount of smoke coming out.  *   *   *   I have not seen any engines properly equipped throw sparks. I have seen engines throw sparks, and in my opinion they were improperly equipped."

This witness on cross-examination also expressed the opinion that such an engine as 100 properly equipped would not emit sparks of sufficient vitality to set a fire.  Reifsnider was the only one of the train crew called as a witness.

Hobbs, defendant's general foreman who had been its boiler maker and boiler inspector, testified that he was familiar with engine No. 100 and had known it

for 13 years, had been inside of it and observed its extension front, the nature of which he described, making reference to a diagram, explaining the purpose, operation, and effect of certain parts and appliances designed to prevent fire and sparks from escaping, and stated that on July 11th, the date of the fire, engine 100 was equipped with a standard front-end netting, but did not claim, and is not shown, to have examined or seen it at or near that time, and did not testify to its then condition or state of repair from personal knowledge. On cross-examination he testified, in part:

"The spark netting sometimes gets warped, and, if not properly fastened, will warp away from the door that goes into the smokestack. The wires in the netting wear out from the action of the cinders in the course of time, and not infrequently they wear out when the engine is on the road."

It can be contended with reason that the testimony of these witnesses, taken as a whole and given full credit, falls short of conclusively showing that this engine, at least 13 years old, was, at the time of the fire, in all parts and particulars specified in the statute, properly equipped and in good order.

Plaintiff called in rebuttal a locomotive engineer named Westcott, who, qualifying to testify on the subject, stated:

"I ran and fired about 13 years out of Durand and Bay City and also fired in Saginaw yards. On account of the lumber yards, sawdust, mills, etc., at Saginaw yards, I gave particular attention to the spark question."

The substance of his testimony, based on observation and experience, was, so far as it had any probative force, that an engine properly equipped as this was said to be, and in good order, would not throw sparks with sufficient vitality to set a fire at the distance shown in this case. This was qualified by the

statement on cross-examination that dry weather would add·to the vitality of the spark, and it was possible in a long period of dry and very warm weather for a spark which would set fire to get out of such an engine. Without reviewing at length the objections launched against his testimony, we conclude that no reversible error appears in the rulings relating to it, under *Union Ice Co.* v. *Railway Co., supra,* and *Potter* v. *Railway Co.,* 157 Mich. 216 (121 N. W. 808, 22 L. R. A. (N. S.) 1039). In the latter case witnesses who were experienced locomotive engineers were allowed in rebuttal to give testimony to the effect that an engine in good order and properly managed, as defendant's evidence showed the one in question was, would not throw sparks and set a fire 81 feet distant. Of the admissibility of their testimony, the court said:

"A fair interpretation of their testimony is that, although some of the questions seem to call for scientific conclusions, the answers were, for the most part, really based upon their observation and experience as to the distance live or burning sparks would be carried if the engine was in proper order. We are satisfied that the testimony of these locomotive engineers raised a question of fact for the jury, and that the court did not err in refusing to direct a verdict."

Defendant's assignment of error on refusal of the court to receive in evidence its exhibits 6 and 7, being reports of inspection of engine 100 made by Rathburn immediately before and after the date of the fire, would be well taken if those exhibits had been again offered in accordance with suggestion of the court and squarely rejected. *Worden Lumber & Shingle Co.* v. *Railway Co.,* 168 Mich. 74 (133 N. W. 949). We do not, however, think that the objection can fairly be urged or considered here. The record discloses that during the examination of Hobbs, the first witness called as to the condition of the engine, he was shown these exhibits and identified them as regular inspec-

tion reports made by Rathburn and given him by the roundhouse foreman, and kept in the office of the master mechanic. Counsel for defendant then offered them in evidence, stating the theory on which they were offered. No objection was made by opposing counsel, but the court said:

"I think you will have to pass it. I have some doubt about their being competent. You may present it to me later."

To which counsel replied, "An exception."

When Rathburn was subsequently called as a witness, he was shown and identified these reports as made by him, and had the benefit of them to refresh his recollection if so desired; but they were not again offered in evidence, nor the matter again called to the attention of the court and presented "later" for a final ruling, as the court had suggested to counsel when expressing doubts and deferring the question for further consideration at the time it first arose. Manifestly, the court desired to give it further consideration, and, with but tentative expression of opinion, made it clear that the question was left open by an invitation to call for a final ruling if desired. No objection had been made by opposing counsel, and in the light of existing authorities it is but reasonable to presume that had these exhibits been again offered, after being fully identified by the witness who made them, a favorable ruling would have resulted. If counsel desired to put these exhibits in evidence or to save an exception on their rejection, we think in fairness to the court they should have been presented later, and, under the circumstances disclosed, no error can fairly be predicated on such tentative action of the court.

The court is not required to deal in this inquiry with the significance or force of defendant's testimony, so long as it is not conclusive and an issue of fact is raised. We are constrained to conclude from this rec-

ord as a whole that there is fair room for inference, based upon evidence, that equipment was defective, and what inference, if any, should be drawn was a matter for the jury.

The judgment is affirmed.

BROOKE, C. J., and MCALVAY, KUHN, STONE, OS-TRANDER, BIRD, and MOORE, JJ., concurred.